IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BRANDON SCOTT MEEK,

            Plaintiff,

v.                                                          OPINION and ORDER

CHASE BROCK, GREGORY KASCHINSKE,             21-cv-545-jdp
CHRISTOPHER WEBER, and COLUMBIA COUNTY,

            Defendants.[1]

---

Plaintiff Brandon Scott Meek, appearing pro se, alleges that Columbia County sheriff's deputies used excessive force in arresting him while he was disoriented from a concussion. I granted him leave to proceed on Fourth Amendment claims against the officers involved in his arrest and against Columbia County.

Defendants have filed a motion for summary judgment, Dkt. 35, contending that their uses of force were justified by Meek's aggressive and resistant behavior. Meek is largely unable to dispute defendants' firsthand account of events because he has virtually no memory of defendants' uses of force, and the audio and video recordings of the events do not materially contradict defendants' account. I will grant defendants' motion for summary judgment and dismiss the case.

---

[1] I have amended the caption to reflect the proper spelling of defendants' names as reflected in their submissions.

PRELIMINARY MATTERS

Defendants object to many of Meek's responses to their proposed findings of fact as unsupported by admissible evidence. This case concerns Meek's arrest after a domestic violence incident in which Meek hit his head against his bedroom wall. At his deposition, about four years after his arrest, Meek stated that he "think[s] it knocked [him] out," Dkt. 43, at 46. Although he regained consciousness after he hit his head against the wall, Meek repeatedly stated at his deposition that—with the exception of a couple of isolated memories—he could not recall what happened that night after he hit his head. *See, e.g., id.* at 63 (answering "Correct" to questions asking whether he had no recollection of events between his 911 call and arriving at the jail); and 68 ("I've been able to put together pretty much what happened going up to it. After I struck my head, I have a few seconds of memories, and that's it.").

Meek supports his responses to defendants' proposed findings of fact with a declaration stating that his responses are:

> made by my own personal knowledge, and the information I have gathered from Audio/Video information from Defendant Brock's Personal Audio Recording Device and Defendant Brock's Vehicle Dash Camera, provided by the Columbia County Sheriff's Department, Defendants multiple Written Police reports, Narratives and Declarations, and Multiple Photo's of the scene. I required these pieces of evidence to help me put together the missing moments I cannot recall, after I struck my head on our bedroom wall the night of September 8, 2018.

Dkt. 71, at 2.

Meek attempts to dispute defendants' account of various parts of the events, but it is clear from his filings that he does not actually have personal knowledge of most of those events because of the head injury he suffered. Meek explicitly concedes as undisputed proposed findings defendants submitted stating that he does not recall the events in question.

*See, e.g.*, Dkt. 70, ¶ 36 ("Meek does not recall anything that happened after hitting his head except for two distinct memories."); ¶ 207 ("Meek has no recollection of the interaction with the officers at the squad car."); ¶ 231 ("Meek has no recollection of the events that took place in the changeover area of the jail."). Instead, Meek attempts to infer what occurred from video and audio footage, the police report, and other evidence. After briefing was completed on defendants' summary judgment motion, Meek submitted a document titled "Plaintiff's Affidavit to Memory Recall," in which he conclusorily states that he has "regained a considerable amount of [his] memory" and can now "account for almost every minute before, during and a little after the 'attacks' upon [him] by the defendants." Dkt. 103. But Meek does not explain what he remembers about those events, nor does he seek leave to submit supplemental proposed findings. Thus I will disregard Meek's proposed findings about events occurring after he hit his head that are not supported by other evidence in the record, with the exception of the few isolated memories that Meek discussed at his deposition.

Meek has also not submitted his entire brief in opposition or entire set of exhibits he refers to in his materials, repeatedly stating that there have been problems with mailing USB drives containing those documents from his correctional institution. After the court received only pages 21–35 of his brief, the court gave him another chance to file the remainder of his brief, by paper copies if necessary. *See* Dkt. 82 and 84. Despite filing various other documents Meek did not submit the rest of his brief. Because Meek stated that he unsuccessfully attempted to mail a USB drive containing two audio recordings made by defendants—his Exhibits 4 (an interrogation of his wife at UW Hospital) and 21 (audio from the jail after his arrest)—the court directed defendants to submit copies of those recordings, Dkt. 106, which

3

they did submit. I have reviewed those recordings in considering defendants' motion for summary judgment.

UNDISPUTED FACTS

Plaintiff Brandon Scott Meek is currently incarcerated at Kettle Moraine Correctional Institution. This case concerns his September 8, 2018 arrest by Columbia County deputies Chase Brock, Gregory Kaschinske, and Christopher Weber that led to his current incarceration.

That day, between 3:15 and 4:30 p.m., Meek and his then-wife Donielle Meek smoked cocaine.[2] They then watched television in their living room. That afternoon and evening, Meek consumed one and a half large wine coolers and Donielle consumed two. Donielle then left to purchase more wine coolers.

After Donielle returned, they began "wrestling around" and having a "tickle war." Dkt. 43, at 40. Donielle became upset and left the room. Shortly after, Meek found Donielle in their bedroom and grabbed Donielle's wrist to pull her up for a hug and to tell her that he was sorry. Donielle punched him with her left hand. Meek stepped behind her and grabbed around her body in an effort to pull her down onto the bed. When Meek pulled Donielle backward, she "kicked off the bedframe" and she and Meek fell headfirst into the wall. Meek believes that this knocked him unconscious. After coming to, Meek remembers grasping Donielle's hand and trying to pull her up, but Donielle saying, "Ow, ow, ow." Dkt. 43, at 53.

At 10:20 p.m., Meek called 911 requesting medical attention for Donielle, whose neck was injured. Defendant officers Brock, Weber, and Kaschinske were dispatched to the house.

---

[2] For the sake of clarity I will refer to plaintiff Brandon Scott Meek as "Meek" and Donielle Meek as "Donielle" throughout this opinion.

Dispatch informed Kaschinske that it was a possible domestic disturbance and that the woman at the house believed that her neck was broken.

Brock and Weber arrived at the house about 20 minutes later. An ambulance was already there, with EMS personnel tending to Donielle. A few minutes later, Kaschinske arrived. He saw Donielle being placed onto a backboard and learned that EMS was going to take her to UW Hospital.

Brock spoke to Meek with Weber present. The officers observed that Meek had bloodshot, watery eyes, and slightly slurred speech, that Meek's movements appeared uncoordinated, and that his breath smelled of alcohol. Meek told Brock that Donielle was drunk, that he and Donielle had had an argument in the living room, that Donielle went into the bedroom, and that shortly after she began screaming that she had broken her neck.

Kaschinske spoke with Donielle, who told him that when they were in the living room, Meek grabbed her by the neck with his forearm and took her down to the ground. Donielle stated that she and Meek frequently "goof around" or wrestle, but the incident that night did not end as goofing around, which I take to mean that Meek was physically violent.

Kaschinske went into the kitchen where the other officers were speaking with Meek. Kaschinske interrupted Brock and began interviewing Meek about what had happened. Kaschinske believed that Meek's story was inconsistent, particularly when Kaschinske mentioned that Donielle said that she and Meek were "goofing around" or wrestling. At one point during the conversation, Meek stepped closer to Kaschinske and "squared up" to him as if Meek was going to hit him. After Kaschinske told Meek that he believed he was leaving out part of the story, Brock asked Meek what happened. Meek stated that there was no physical

5

violence or even any play wrestling or goofing around, and that he had no idea why Donielle said that she had broken her neck.

Meek suggested that he needed to hold Donielle's wrists because she was violent when drunk. Meek asked if he could demonstrate a grip on Brock's arm; Brock said they he'd prefer that he not. Nonetheless, Meek grabbed both of Brock's wrists and then let go. Brock asked whether Meek did that to Donielle and Meek said, "Not that I can remember." Dkt. 39-5, at 42:50 (placeholder for audio from Brock's personal recording device, numbered "County 476").[3] Brock asked why Meek would bring up the grip. Meek responded that that's how he would respond if Donielle were throwing punches at him, but that he didn't remember whether that happened that night. Meek then explained that he and Donielle were arguing and Donielle either fell off the couch or jumped over it, and punched Meek.

While Brock continued interviewing Meek, Kaschinske decided that he was going to arrest Meek for domestic battery. Kaschinske told Meek that he was being placed under arrest. Defendants state that Meek "immediately became defensive" and repeatedly yelled, "Bullshit!" *Id.* at 46:29. They also say that he said that "he was not going to jail" Dkt. 40, at 3–4, but the audio of the incident did not pick that comment up, so I will not credit that proposed finding. Meek clenched his fists and started walking toward Weber. Weber put his arms out in front of him to prevent Meek from getting closer to him. Meek slapped Weber's arms away. Brock tried to place Meek in a "compliance hold," but Meek tensed his body and pulled his arms away from Brock. Kaschinske grabbed Meek's left arm and both he and Brock told Meek to stop resisting multiple times, but Meek continued to struggle against them. Weber drew his taser

---

[3] This recording includes video from defendant Brock's squad car dashcam, but it captures none of the events inside the Meek home.

and fired it at Meek's abdomen, but Weber heard an arcing noise indicating that the probes had not connected to the target. Meek's body posture and demeanor did not change, another sign that the taser didn't strike Meek.

Meek turned toward the kitchen counter. Defendants state that there was a butter knife and a steak knife on the kitchen counter next to the stove, where Meek scuffled with defendants. Defendants state that the presence of weapons gave them additional reason to use force against Meek. Meek submits a photo of the counter taken by officers at the scene, Dkt. 71-3, at 7, that does not show a knife on the counter, although the counter is so cluttered that the photo is not definitive proof that no knife was there. But it's enough for a reasonable jury to infer that no knife was there.

Weber attempted to "drive stun" Meek's thigh with his taser—meaning that the taser is pressed directly against the target's body—but he was unable to do so with Meek scuffling with the officers. Weber instead wrapped his left arm around Meek's chin and used his body to push Meek's lower body forward to get Meek to the ground. Meek landed with his stomach on the floor. Weber lay on top of Meek on the floor and continued to hold Meek's head in a compliance hold. While Weber grabbed Meek, Brock grabbed Meek's left arm and placed it into a compliance hold, by which I take to mean that Brock twisted it behind Meek's back. Meek's right arm was underneath his body.

Brock was able to handcuff Meek's left wrist, and he yelled at Meek to stop resisting and release his right arm from under his body. Meek continued to struggle against the officers and did not pull out his right arm. Kaschinske used his taser to drive stun Meek's left upper back. Meek did not stop resisting the officers after the drive stun. Kaschinske administered a second drive stun to Meek's left upper back after which Meek released his right arm from

7

underneath his body. Brock handcuffed Meek's right wrist. Weber removed his arm from Meek's chin.

Shortly thereafter, defendants asked Meek to relax his arm. Meek responded, "I am not going to relax shit. Go ahead and fucking tase me, stab me some more, I want to know what the fuck is going on." Dkt. 39-5, at 49:38. Meek was given a breathalyzer test at his home: his blood alcohol content was 0.14.

Defendants escorted him to a squad car, with Meek dragging his feet at times and acting like "dead weight" to make it harder for the officers to escort him. Meek repeatedly loudly asked defendants why he was being arrested when he hadn't done anything wrong. When Kaschinske opened the back door of his squad car, Meek refused to get into the car. Eventually, Meek sat on the backseat of the squad car, but refused to put his right leg inside the car. Meek told them, "Don't you fucking push me again" and "No, motherfucker, you better back the fuck up" while refusing to pull his leg in. *Id.* at 51:39. Weber pushed on Meek's face using a "mandibular pressure point" technique, Brock pushed Meek's leg into the car, and they closed the door.

After Meek was secured in the squad car, Weber and Brock say that they heard him yell something like "you're all dead men," but the audio footage didn't pick this comment up so I will not credit that proposed finding.

The officers transported Meek to the intake room of the jail, where his handcuffs were removed. Meek became agitated while discussing bail and Donielle's whereabouts. Staff brought Meek into the "changeover" area, where he began resisting staff. Non-defendant staff tackled Meek to the ground, where Meek continued to resist and attempt to get himself up. Defendants Weber and Brock grabbed his legs, but Meek wouldn't put out his hands to be

8

handcuffed. After Kaschinske used his taser to drive stun Meek twice, Meek stopped resisting and put out his hands to be handcuffed. Meek's blood was tested for alcohol at the jail: his blood alcohol content was 0.156.

At about 1:00 a.m. Meek placed a phone call to his mother-in-law from jail, stating "I was pissed off," and "I beat up a cop." Dkt. 39-6, at 3:45 (placeholder for audio of Meek's call to his mother-in-law). He also stated, "I'm trying to figure out why the fuck they're coming after me, and I put a couple of them down." *Id.* at 9:21. Several days later, Meek called a friend from the jail. She asked him whether he fought against the officers, and he responded, "I did absolutely, and that was wrong." Dkt. 39-7, at 15:32 (placeholder for audio of Meek's call to his friend). Meek says that he made the statements in these phone calls because he was only repeating what officers had told him. Particularly given that Meek otherwise states that he cannot recall what happened after he hit his head, at the summary judgment stage I will infer that Meek did not have personal knowledge of resisting officers when he placed those phone calls, so I won't treat the calls as admissions that he fought against the officers.

Meek pleaded no contest to second-degree reckless injury with a domestic abuse modifier and two counts of resisting or obstructing an officer. Meek states that his left shoulder, which had previously been surgically reconstructed, was badly injured by defendant's actions.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

I granted Meek leave to proceed on excessive force claims against defendants Brock, Kaschinske, Weber, and Columbia County under the Fourth Amendment to the United States Constitution.

**A. Individual defendants**

A police officer's use of force during an arrest is judged under the Fourth Amendment reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The court must consider the officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. The court must consider the officer's actions under the particular facts of the case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

The individual defendants seek summary judgment on three grounds. First, they argue that Meek's excessive force claims are barred by *Heck v. Humphrey*, 512 U.S. 477, 481 (1994), under which a prisoner may not bring a claim under § 1983 if success on that claim would necessarily imply that the prisoner's conviction or sentence is invalid. Meek pleaded guilty to two counts of resisting or obstructing an officer in conjunction with the incident. But defendants do not explain the factual underpinnings for those charges. There are four different stages of Meek's arrest and detention at which he believes defendants used excessive force on him—the officers tackling him to the floor of his kitchen, their further force before handcuffing him, his placement in the squad car, and his treatment at the jail—and defendants do not explain which part of the events his charges correspond to. *Heck* also doesn't necessarily preclude a claim that an officer uses excessive force against a suspect who initially resists the officer. *See, e.g., Evans v. Poskon*, 603 F.3d 362, 364 (7th Cir. 2010) (*Heck* would preclude claim relying on plaintiff stating he did not resist, but would not preclude claims that officers "used excessive force to effect custody" or "beat him severely even after reducing him to custody"). So I will not grant summary judgment to defendants based on *Heck*.

10

Second, defendants argue that the undisputed facts show that no reasonable jury could find that they used unreasonable force. Third, they argue that they are entitled to qualified immunity. Under that doctrine, a plaintiff may not obtain damages for a constitutional violation against a public official unless the plaintiff shows that the official violated clearly established law. *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 725 (7th Cir. 2013). Law is clearly established on an excessive force claim if: (1) there is a "closely analogous case" holding that the specific type of force used by the defendant is excessive; or (2) "a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question." *Cibulka v. City of Madison*, 992 F.3d 633, 639–40 (7th Cir. 2021) (internal quotation marks and alterations omitted).

"'[S]ummary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations . . . .'" *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020) (quoting *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010)). But a court "may consider reasonableness as a matter of law when there are sufficient undisputed material facts to draw a conclusion." *Siler*, 957 F.3d at 759. The material facts are undisputed here, largely because Meek remembers almost none of his interactions with defendants.

I will address each use force by defendants in turn.

**1. Tackling to the floor**

A main focus of Meek's complaint was that defendants used force against him even though he was disoriented from a concussion. It is undisputed that Meek was unsteady before defendants placed him under arrest and tackled him to the kitchen floor. But defendants state that Meek didn't tell them that he had hit his head, and that they attributed his clumsy

11

movements to being intoxicated: he had bloodshot eyes, his breath smelled of alcohol, and Meek showed them multiple empty cans of alcohol.

Officers may use force against a suspect resisting arrest. *Fitzgerald v. Santoro*, 707 F.3d 725, 734 (7th Cir. 2013) (collecting cases). But they are still barred from using force "that 'would not ordinarily harm an arrestee, but would nevertheless cause pain or injury to the particular individual being placed under arrest,' for example, one who is inebriated and unsteady on his feet." *Gupta v. Melloh*, 19 F.4th 990, 999 (7th Cir. 2021) (quoting *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009) (alterations adopted)). Here there is no evidence that defendants used force against Meek as a reaction to his stumbling. Rather, defendants state that at various points of their conversations Meek acted aggressively: Meek "squared up" as if he was going to hit Kaschinske, repeatedly clenched his fists and teeth in a manner they found threatening, grabbed Brock's wrists and twisted them, and stated that he was trained in martial arts and wrestling. He was also suspected of a crime of violence—assaulting Donielle and injuring her. Then, defendants say that when they told Meek that he was being placed under arrest, he repeatedly shouted "bullshit," clenched his fists, walked toward Weber, slapped Weber's arms out of the way as Weber tried to stop him, and pulled away from defendants as they tried to subdue him. Weber attempted to tase him but was unable to. The officers then tackled him to the floor.

Meek attempts to dispute some parts of these events by referring to the audio, police reports, and his own declaration, but the audio doesn't capture the parties' physical actions and the police reports support defendants' version of events. Meek also refers to his own declaration, but because of his memory loss he simply does not have personal knowledge of the events leading up to him being tackled to the ground. Without any evidence supporting his

purported version of events, his mere speculation that events unfolded differently is not enough to create a genuine dispute of material fact. *See, e.g.*, *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)).

From the undisputed facts about Meek's aggression and resistance to arrest, I conclude that defendants' takedown of Meek was reasonable. But even if it was a closer call, they would be entitled to qualified immunity. Officers don't have to show that they used the least restrictive means in protecting themselves and others. Rather, courts "give considerable leeway to law enforcement officers' assessments regarding the degree of force appropriate in dangerous situations." *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 473 (7th Cir. 2015); *see also Graham*, 490 U.S. at 396–97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."); *Dockery v. Blackburn*, 911 F.3d 458, 468–69 (7th Cir. 2018) ("Even if the officers misconstrued [the plaintiff's] actions or misjudged the amount of force needed to subdue him, qualified immunity protects officers from mistakes in judgment of this sort."). I will grant summary judgment to defendants on this portion of Meek's excessive force claims.

### 2. Handcuffing

Meek also contends that defendants used excessive force against him after they tackled him and then attempted to handcuff him. Weber lay on top of Meek on the floor, holding onto his head while Brock twisted his left arm behind him and handcuffed it. One of the few portions

of the events that Meek remembers is "being driven to the ground with a very heavy man landing on my back, ripping on my neck, cranking my head back and tasting blood in my mouth, and both my shoulders were in extreme, extreme pain." Dkt. 43, at 66. Defendants state that Meek continued to push against them and would not release his right arm from under his body, so Kaschinske tased him twice in his upper left back. In the audio footage, Meek can be heard stating, "I can't," with an officer telling him to move his body up so that he could pull his arm out. Dkt. 39-5, at 47:24. They were able to get Meek's right arm out from under his body and finish handcuffing him.

Meek contends that he wasn't resisting defendants during these events, but he doesn't base that statement on his personal knowledge: the only thing he remembers about this set of events is Weber being on him and pulling back his head. Without him being able to remember whether he was resisting defendants, it is undisputed that he continued to struggle against them. That made defendants' continued use of force against him—including the taser— reasonable, or at least covered by qualified immunity. *See, e.g.*, *Dockery*, 911 F.3d at 467 ("an officer's use of a Taser against an actively resisting subject either does not violate a clearly established right or is constitutionally reasonable").

The audio does reveal that after being tased Meek said that he couldn't remove his right arm from underneath his body. That supports a reasonable inference that Meek couldn't pull out his right arm. But it is undisputed that Meek continued to struggle against defendants regardless of what he was doing with his right arm, and in any event, Meek stated that he couldn't move his arm only after he was tased. There isn't any evidence that defendants used unnecessary force after Meek said that he couldn't move his arm. So I will grant summary judgment to defendants on this aspect of Meek's claims.

### 3. Getting into squad car

Defendants again used force on Meek to get him into a squad car. Defendants state that Meek dragged his feet and acted like "dead weight" on his way to the car, and kept belligerently asking them why he was being arrested when he hadn't done anything wrong. Then after sitting in the back seat of the car he refused to pull his right leg inside, even after repeatedly being told to do so by defendants, while making threatening comments to them. Meek doesn't recall this portion of events. This is the only part of the events that was captured by Brock's squad car dashcam video as well as audio, but the video is not clear enough to show exactly what happened, other than defendants pushing against something while telling Meek to put his leg in the car. Dkt. 39-5, at 51:38. The video does not support a reasonable inference that defendants used excessive force against Meek. Rather, it was reasonable for them to use force to get Meek into the car after he continued to yell at and resist them. I will grant summary judgment to defendants on this part of Meek's claims.

### 4. Tasing at jail

The final part of the events occurred after defendants brought Meek to the jail and removed his handcuffs. Defendants say that Meek again became belligerent and resistant, so non-defendant staff tackled him to the ground and Kaschinske tased Meek twice after he refused to put out his arms to be handcuffed.

Meek brings only a claim about being tased at the jail; he does not bring a claim about being forced to the ground. Meek contends that the tasing was excessive because he was already handcuffed when he was tased, but he concedes that he has no memory of the incident, so he isn't basing that assertion on his personal knowledge. He cites audio footage from the incident, but the audio isn't sufficient to tell precisely what happened. Dkt. 107-1 (placeholder for video

from defendant Brock's dashcam and audio from Brock's personal recording device, numbered "County 477"). Without evidence supporting his purported version of the events, Meek is unable to create a genuine dispute of material fact over what happened. Instead, I must accept defendants' firsthand account of the events, in which Meek continued to be belligerent, physically resistant, and uncooperative with defendants' attempts to handcuff him. I conclude that defendants' use of force was reasonable. But even if they had misjudged the amount of force necessary to re-handcuff Meek, they would be entitled to qualified immunity. Accordingly, I will grant defendants' motion for summary judgment on this set of excessive force claims.

## B. Lack of medical care

In his complaint, Meek contended that because he had suffered a concussion, defendants should have had him examined before arrest or at least treated as someone with a medical problem rather than as a dangerous suspect. I did not explicitly allow him to proceed on a medical care theory, but the parties address it in their briefs so I will discuss it here.

Because defendants' actions concern events while Meek was under arrest, his medical care claim also arises under the Fourth Amendment. *See Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020); *Currie v. Chhabra*, 728 F.3d 626, 629 (7th Cir. 2013). As with his excessive force claim the question is whether defendants acted unreasonably. *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007). I must consider "(1) whether the officer ha[d] notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigative concerns." *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011).

Meek's medical care claim fails because defendants did not have notice that he was concussed. Meek was not steady on his feet, but there wasn't any reason to attribute this to a concussion, as Meek never told defendants that he had hit his head or blacked out, and there was an obvious alternate explanation for his unsteadiness—intoxication. Without any evidence that an objectively reasonable officer would have known about Meek's concussion, Meek cannot succeed on a Fourth Amendment claim about defendants' failure to have him treated.

**C. Columbia County**

I also granted Meek leave to proceed on claims against defendant Columbia County under, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), under the theory that the county failed to train its deputies to recognize a suspect's mental health impediments before using force to arrest them. Dkt. 8, at 3. But the evidence here shows that there was no reason for defendants to suspect that Meek had suffered a concussion. It also shows that defendants used reasonable force or are at least entitled to qualified immunity on the underlying claims against them. Meek conclusorily suggests that defendants' actions violated county training in making arrests, but he doesn't explain what specific rules they violated or why those violations should be imputed to the county because of a lack of training. So I will grant summary judgment to defendants on Meek's claim against the county.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 35, is GRANTED.

2. This case is DISMISSED.

3. The clerk of court is directed to enter judgment accordingly and close the case.

Entered September 26, 2023.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge